Filed 9/16/20  P. v. Butchart CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OMAR BUTCHART et al.,<br><br>    Defendants and Appellants. | B297507<br><br>(Los Angeles County<br>Super. Ct. No. BA444252) |

APPEAL from judgments of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed with directions.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Omar Butchart.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant Jose Urista.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo, Acting Supervising

Deputy Attorney General, Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Omar Butchart and Jose Urista appeal their convictions on two counts of murder (Pen. Code, § 187, subd. (a)),[1] assault with a semiautomatic firearm (§ 245, subd. (b)), and shooting at an occupied motor vehicle (§ 246). They contend (1) the trial court abused its discretion in denying their motion for a mistrial after the People's gang expert testified about the significance of two teardrop tattoos on Butchart's face, (2) the trial court erred in instructing the jury with CALCRIM No. 315, and (3) the trial court erred in imposing certain fines and assessments without determining their ability to pay, as required by *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Urista separately contends that the trial court failed to ask him under section 1200 if there was any legal cause why the court should not pronounce judgment and that the court's failure to do so deprived him of a fair hearing on his motion for new trial and for new counsel.

We conclude that the trial court did not abuse its discretion in denying the motion for mistrial and that any error was harmless. We also conclude that Butchart's and Urista's challenge to CALCRIM No. 315 is forfeited and meritless and that the trial court did not violate either defendant's due process rights under *Dueñas*. Finally, we conclude Urista has not shown

_____

[1]     Undesignated statutory references are to the Penal Code.

2

the trial court's failure to make the inquiry under section 1200 prejudiced him. Therefore, we affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Double Murder*

Tiny Boys is a criminal street gang that operates in an area east of downtown Los Angeles. Tiny Boys considers the Primera Flats gang an ally, and the El Monte Flores gang a rival. Tiny Boys uses the slur "Egg McMuffin" or "Muffin" to disparage members of the El Monte Flores gang. Prospect Park is in the territory claimed by Primera Flats.

On February 7, 2016 Henry Sanchez, Maria Cordova, and Joshua Terrazas went to Prospect Park to smoke marijuana. Sanchez and Terrazas both wore T-shirts displaying the words "El Monte." Sanchez also wore a Florida Marlins baseball team hat with the letter "F" that the El Monte Flores gang had adopted as its insignia. Sanchez was a member of the El Monte Flores gang in high school, but was no longer an active member. Terrazas felt unsafe wearing "El Monte" clothing in Prospect Park because the park was not "El Monte Flores territory." While smoking, Terrazas noticed a black SUV circle the park. Terrazas made eye contact with both the driver and the passenger of the SUV. The driver and the passenger gave Terrazas a "challenging stare."

Terrazas had a "bad feeling," and he, Sanchez, and Cordova got into Cordova's car and left the park. The black SUV followed, and at a stop light the SUV pulled up next to Cordova's car. Butchart, armed with a gun, got out of the SUV and ran to the passenger side of Cordova's car. Sanchez, who was in the driver's

3

seat, said, "I don't want a beef with you fools." Butchart replied, "Fuck Muffins." Sanchez said, "Don't shoot me in front of my . . . girlfriend." Butchart opened fire at Sanchez, shooting him three or four times. Sanchez "passed out," Terrazas felt their car speeding up because Sanchez's foot was on the accelerator, and Terrazas and Cordova tried unsuccessfully to stop the car. The car careened "out of control," traveling at a high rate of speed, before it hit a van. Terrazas "passed out," and when he woke up, he found himself upside down in the car. Sanchez died from two gunshot wounds to his chest. Cordova died from a "massive skull fracture and neck fracture" she suffered in the car crash.

B.    *The Investigation*

Surveillance footage of the shooting showed a black SUV stopping next to a white sedan at an intersection. The shooter got out of the SUV with a gun in his right hand, ran to the passenger side of the white sedan, fired shots into the car, and ran back into the SUV. The surveillance video captured the license plate of the black SUV, which detectives traced to Urista as the registered owner. A gang expert recognized Butchart as the shooter in the surveillance video. Urista, whose cell phone listed Butchart in his contacts by his gang moniker, exchanged text messages with Butchart a few days before the shooting. Records of the signals transmitted by Butchart's and Urista's cell phones showed the two phones were near each other and in the area of Prospect Park at the approximate time of the shooting.

4

C.    *The Charges*

The People charged Butchart and Urista with two counts of murder (§ 187, subd. (a), counts 1 and 2), assault with a semiautomatic firearm (§ 245, subd. (b), count 3), and shooting at an occupied motor vehicle (§ 246, count 4).[2]  The People alleged the special circumstances that Butchart committed more than one murder (§ 190.2, subd. (a)(3)) and that he committed the murders while an active participant in a criminal street gang and to further the activities of the gang (§ 190.2, subd. (a)(22)).  The People also alleged Butchart and Urista committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b).

As to counts 1, 2, and 4 the People alleged a principal personally and intentionally used and discharged a firearm causing death, within the meaning of section 12022.53, subdivisions (b) through (e)(1).  The People also alleged Butchart personally and intentionally used and discharged a firearm causing great bodily injury or death, within the meaning of section 12022.53, subdivisions (b) through (d).  As to count 3, the People alleged Butchart personally used a firearm, within the meaning of section 12022.5, subdivisions (a) and (d).

---

[2]    The People also charged Butchart with possession of marijuana in a custodial facility (§ 4573.6, subd. (a), count 5), to which Butchart pleaded guilty.

D.    *The Evidence at Trial*

At trial Terrazas identified Butchart as the gunman and Urista as the driver of the SUV.  Terrazas testified that he made eye contact with Butchart and Urista as the SUV drove by him and his friends at the park and that he saw Urista stare into Cordova's car when Butchart shot Sanchez.  Terrazas admitted that he failed to identify either Butchart or Urista in previous questioning by the police, but explained that he refused to identify any of the participants in the shooting during the initial investigation of his friends' murders because he "was scared at the time" of "the gangs in the neighborhood."

Officer Jorge Talledo, a Los Angeles Police Department gang expert, identified Butchart as the shooter in the surveillance video of the shooting.  Officer Talledo testified that he had encountered Butchart eight to 10 times prior to the shooting, that he could recognize Butchart on the street, and that the tattoos, clothing, and "mannerisms" of the shooter on the video matched Butchart's tattoos, clothing, and mannerisms.  Officer Talledo testified he did not know of any other member of the Tiny Boys gang or Primera Flats gang who had tattoos similar to the "T" and "B" tattoos Butchart had on his calves.

Officer Steve Megliorino, another gang expert, testified Tiny Boys gang members use (among other symbols) the letters T and B to represent the gang.  Butchart was a member of the Tiny Boys gang, and Urista was an associate of the gang.  Officer Megliorino explained that a gang member commits a crime to show loyalty or allegiance to the gang and that an associate commits crimes for the gang to become a member of the gang.  Officer Megliorino testified, "The gang world . . . revolves around intimidation and fear and respect."  If a young Hispanic male

6

wore a shirt that said "El Monte" in Prospect Park, a Tiny Boys gang member would take it as a sign of disrespect and would retaliate. If gang members did not retaliate when a rival gang member encroached on their territory, "not only do they make themselves look weak, they represent the gang and make the gang look weak, and that can have bad consequences for that gang." Based on a hypothetical shooting that tracked the facts of this case, Officer Megliorino testified the shooting was committed for the benefit of the gang because committing a murder "gains the ultimate respect and/or fear from other gang members and fellow citizens." Officer Megliorino explained the murder, committed in "broad daylight," "puts fear" in the community. Officer Megliorino concluded, "A scared community is a community that doesn't call [the] police," and "a community that doesn't call [the] police allows a gang as such to commit these types of crimes unchecked."

A federal agent testified the cell phone records of Butchart's and Urista's cell phones "would support" the prosecution's theory that Butchart and Urista were together and in the vicinity of Prospect Park and the scene of the crimes at the time of the shooting. The agent also testified the cell phone records showed Butchart and Urista moved geographically apart from each other after the shooting.

The People presented evidence that, shortly after the shooting, Butchart told his mother they needed "to move out immediately," but he did not give a reason. The police apprehended Butchart in Mexico seven months later.

E.	*The Verdict and the Sentences*

The jury found Butchart and Urista guilty on all counts and found true all the allegations.[3] The trial court sentenced Butchart on count 1, the murder of Sanchez with the special circumstance finding of multiple murders, to life in prison without the possibility of parole, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and 10 years for the gang enhancement under section 186.22, subdivision (b).  On count 2, the murder of Cordova with the special circumstance finding of multiple murders, the court sentenced Butchart to a consecutive term of life in prison without the possibility of parole, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and imposed but stayed under section 654 a term of 10 years for the gang enhancement.  On count 3, assault with a semiautomatic firearm, the court imposed and stayed under section 654 execution of a sentence of nine years, and on count 4, shooting at an occupied vehicle, the court imposed and stayed under section 654 execution of a sentence of seven years.

The trial court sentenced Urista on count 1, the murder of Sanchez, to a prison term of 25 years to life, plus 25 years for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).  On count 2, the murder of Cordova, the court sentenced Urista to a consecutive term of 25 years to life, plus 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).  The court stated that, under section 186.22, subdivision (b)(5), Urista would not be eligible for parole

---

[3]	It does not appear the jury decided the special circumstance allegation under section 190.2, subdivision (a)(22).

8

for 15 years on either count 1 or count 2.[4]  The court imposed and stayed under section 654 execution of sentences of nine years on count 3 and seven years on count 4.  Butchart and Urista timely appealed.

---

[4]     This was error.  "A defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53.  In contrast, when another principal in the offense uses or discharges a firearm but the defendant does not, there is no imposition of an 'enhancement for participation in a criminal street gang . . . in addition to an enhancement imposed pursuant to' section 12022.53."  (*People v. Brookfield* (2009) 47 Cal.4th 583, 590; see § 12022.53, subd. (e)(2).)  Because Urista did not discharge a firearm, the court's imposition of minimum parole terms under section 186.22, subdivision (b)(5), resulted in an unauthorized sentence and must be corrected.  (See *People v. Anderson* (2020) 9 Cal.5th 946, 962 ["[t]he unauthorized sentence doctrine is designed to provide relief from forfeiture for 'obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings'" and "applies when the trial court has imposed a sentence that 'could not lawfully be imposed under any circumstance in the particular case'"]; *People v. Zaldana* (2019) 43 Cal.App.5th 527, 533 [where the defendant receives "an unauthorized sentence, we must correct it"], review granted Mar. 18, 2020, S259731.)

9

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion for a Mistrial*

Butchart and Urista contend the "trial court erred prejudicially by denying [their] motion for mistrial after a gang expert testified that [Butchart's] two teardrop tattoos signified he had murdered two people." Butchart and Urista argue the "inadmissible opinion resulted in incurable prejudice, allowing the jury to hear expert opinion testimony that [Butchart] had murdered two people, in a trial for a double murder." The trial court did not err.

1. *Relevant Proceedings*

The prosecutor questioned Officer Talledo about several tattoos on Butchart's body. A photograph of Butchart taken after February 2016 showed he had two tattoos on his face: one on his forehead, above his right eyebrow, that spelled "Jayden" and another by the corner of his left eye that appeared to be two teardrops. Talledo testified that, prior to February 2016, Butchart did not have these facial tattoos. The following exchange occurred:

"[The Prosecutor]: Showing you . . . People's [Exhibit] 68, in your experience as a gang officer, what is the significance of a gang member tattooing two teardrops next to their eye?

"[Counsel for Butchart]: Objection. Foundation.

"The Court: Overruled.

"[Officer Talledo]: In gang culture it signifies—it usually signifies a murder that that person has committed.

"The Court: No. I'm going to strike that.

10

"[Counsel for Butchart]:  Thank you.

"The Court:  It signifies that he knows someone who has been murdered, isn't that your understanding?

"[Officer Talledo]:  That is not my understanding."

The trial court excused the jurors and expressed its dismay Officer Talledo "suggested that . . . Butchart killed two people. Now, he's on trial for killing two people."  The court stated, "I am very troubled by this."  The court explained that it had presided over more than 300 murder trials and that the court "had it explained on many occasions under oath by those gang experts that the teardrop does not signify that someone killed someone, but rather they are mourning the loss of a fellow gang member."  The prosecutor responded, "I believed—my impression is that it can signify someone has killed somebody.  That's my understanding."  Counsel for Butchart moved for a mistrial and argued that, had she known of this anticipated testimony, she "would have objected . . . as overly prejudicial and inappropriate in this case as an opinion."  Counsel for Urista joined in the motion for a mistrial.

The court reiterated its concern about Officer Talledo's testimony:  "I'm astonished that we're having him say that the fact that there are two teardrops on the cheek of the well-tattooed defendant, who is on trial for a double murder, means he killed two people."  The court stated that it disagreed with Officer Talledo's opinion, but that, if the tattoos meant that Butchart had killed two people in this case or that Butchart put the tattoos on his face intending to signify he was responsible for killing people, the court would not have allowed Officer Talledo's testimony.

11

Counsel for Butchart stated she did not see how the court could cure the "highly prejudicial, inappropriate testimony in this case" because Butchart was on trial for multiple murders and "the jury has now heard [Officer Talledo] say that these tattoos mean that he murdered two people." The court stated that Officer Talledo "testified that he believes the tattoo means the defendant has killed twice" and that "this is wholly inconsistent with the court's understanding based on the testimony of many gang experts over the years." The court observed, however, that the People had "a very strong case" and concluded, "I do not think it is significant [that] it requires a mistrial for the following reasons: I think that I will strike the answer. I'm going to instruct the People to get to the issue of the leg tattoos and that this witness recognizes . . . the back of the calf tattoos, and then we're done with the witness. . . . The fact that it was well established through cross-examination of the only eyewitness in the case that tattoos were not seen[5] is, to me, the governing factor here. Jurors are required to follow the court's instructions. I'm going to tell them to strike the testimony that the court believes is of questionable validity regarding the significance of the teardrop tattoos and we're going to go on."

The court instructed the jury: "I am striking testimony that [Officer Talledo] gave and you may not consider this for any reason. You can't discuss it in the jury room. I am striking the testimony he gave regarding the teardrop tattoos on the face of Defendant Butchart. So just ignore that testimony. It's not part of the evidence in the case."

---

5    Terrazas testified on cross-examination he did not see any tattoos on the shooter.

### 2. *Applicable Law and Standard of Review*

"A court should grant a mistrial '"only when a party's chances of receiving a fair trial have been irreparably damaged."' [Citation.] This generally occurs when '"""the court is apprised of prejudice that it judges incurable by admonition or instruction."""'" (*People v. Johnson* (2018) 6 Cal.5th 541, 581.) "'"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 634.)

"'"Although most cases involve prosecutorial or juror misconduct as the basis for the motion [for a mistrial], a witness's volunteered statement can also provide the basis for a finding of incurable prejudice."'" (*People v. Harris* (2013) 57 Cal.4th 804, 848.) "Disclosing a defendant's prior criminality to the jury can prejudice the defendant's case. But . . . courts have 'considerable discretion' to determine whether such an error warrants granting a mistrial or whether the error can be cured through admonishment or instruction." (*People v. Perez* (2018) 4 Cal.5th 421, 459.) "'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured.'" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428-1429.) "We review the trial court's refusal to grant a mistrial for abuse of discretion." (*People v. Johnson, supra*, 6 Cal.5th at p. 581.)

13

3. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion for a Mistrial, and Any Error Was Harmless*

As a preliminary matter, the trial court's recollection of Officer Talledo's testimony was not entirely accurate. When discussing with counsel what appropriate curative action to take, the court recounted that Officer Talledo "testified he believes it [the two-teardrop tattoo] means the defendant has killed twice." The record, however, reflects the officer testified the tattoo of the two teardrops in gang culture "usually signifies a murder that that person has committed," not two murders. Officer Talledo never testified two teardrops meant Butchart committed two murders.[6]

In light of Officer Talledo's actual, more circumscribed opinion, which the officer couched in general terms ("usually signifies") and did not tie to the specific facts of the case (the murders of Sanchez and Cordova, or even two unspecified murders), the trial court did not abuse its discretion in denying the motion for a mistrial. The court also cured any prejudice by striking the statement and admonishing the jury. We "presume, as always, that the jury followed the court's instructions." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292; see *People v. Franklin* (2016) 248 Cal.App.4th 938, 956 ["[b]ecause we presume the jury followed [the] instructions [citation], we deem any possible prejudice from [the] remarks [about the defendant's

---

[6] The trial court, in an (ultimately misguided) attempt to clarify Officer Talledo's testimony, also referred to what the court believed the tattoo signified in the singular: "It signifies that he knows someone who has been murdered, isn't that your understanding?"

14

criminal history] to have been cured"]; *People v. McNally*, *supra*, 236 Cal.App.4th at p. 1429 ["'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.""'"].)

Butchart and Urista argue Officer Talledo's opinion "constituted evidence of [Butchart's] criminal propensity" and "resulted in incurable prejudice." Statements about a defendant's prior criminal conduct do not necessarily create incurable prejudice requiring a mistrial. (See, e.g., *People v. Dalton* (2019) 7 Cal.5th 166, 240 [witness's comment the defendant "had molested [the witness's] children was not 'so incurably prejudicial that a new trial was required'"]; *People v. Johnson*, *supra*, 6 Cal.5th at p. 581 [trial court did not abuse its discretion in denying a motion for a mistrial based on a witness's statement the defendant, on trial for committing a double murder, "'had already beat two cases like this already'"]; *People v. Perez*, *supra*, 4 Cal.5th at p. 459 [trial court did not abuse its discretion in denying a motion for a mistrial based on a codefendant's comment the defendant "'just got out of the penitentiary'"]; *People v. Ledesma* (2006) 39 Cal.4th 641, 682-683 [witness's statements the defendant had been on death row as a result of prior proceedings in the same case did not warrant a mistrial].) And when Officer Talledo gave his opinion about the significance of a particular tattoo in gang culture, he did not refer to Butchart specifically. Officer Talledo's general comment, which the court struck and instructed the jury to disregard, did not violate Butchart's and Urista's due process rights or irreparably damage their chances of receiving a fair trial. (See *People v. McNally*, *supra*, 236 Cal.App.4th at p. 1429.)

15

Butchart and Urista also argue Officer Talledo's statement "was an inadmissible opinion on the ultimate issue at trial, invaded the province of the jury, and violated [their] federal constitutional rights to due process and a fair trial" because "[t]he . . . opinion amounted to the gang expert's opinion that [Butchart and Urista] murdered the victims, or had murdered others." The record does not support that argument. Putting aside that the court did not admit the allegedly inadmissible testimony and instructed the jury to disregard it, Officer Talledo gave proper opinion testimony about a subject in which he had "'"special knowledge, skill, experience, training, [and] education."'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; see *ibid.* ["[t]he subject matter of the culture and habits of criminal street gangs" is "'"sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"'"]; *People v. Ochoa* (2001) 26 Cal.4th 398, 437-438 [trial court did not abuse its discretion in admitting a gang expert's testimony that the "187" tattooed on the defendant's forehead after the homicides occurred referred to the Penal Code section for murder]; *People v. Williams* (2009) 170 Cal.App.4th 587, 609 ["a properly qualified gang expert may testify about a wide range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing"]; see also *People v. Sanchez* (2016) 63 Cal.4th 665, 676 ["[a]n expert is also allowed to give an opinion about what [case-specific] facts may mean"].) Officer Talledo did not tell the jury that he thought Butchart was guilty or that the two teardrop tattoos meant Butchart killed the two victims in this case. In fact, neither the prosecutor's question nor Officer Talledo's response mentioned Butchart. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1227 [rejecting the defendant's contention an expert testified about the

ultimate issue of the defendant's guilt because the expert "did not testify that defendant was guilty, nor . . . tell the jury whom to believe or direct the jury toward a specific conclusion on any element of the charged crimes"].)

Urista separately argues Officer Talledo's statements "were . . . hearsay and no exception applied that would have allowed their use against Urista." Urista forfeited this argument, however, by failing to make this objection at trial. (See *People v. Clark* (2016) 63 Cal.4th 522, 574 [defendant's failure to object to the admission of alleged hearsay testimony forfeited his argument on appeal].) Even if preserved, Urista's argument fails. The statements were not hearsay; they were admissible statements of the gang expert's opinion. (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139 [gang expert's "testimony about the significance of . . . tattoos and gang signs was similar to that identified as admissible background information in *Sanchez*[, *supra*, 63 Cal.4th 665]"].) Moreover, as discussed, the trial court cured any prejudice by striking Officer Talledo's opinion and admonishing the jury to disregard it, an admonition we again presume the jury followed.

Finally, any error in denying the motion for a mistrial was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *People v. Welch* (1999) 20 Cal.4th 701, 749-750 [*Watson* harmless error standard applies to the denial of motion for a mistrial based on erroneous admission of evidence]; *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 [same]; *People v. Williams* (1981) 115 Cal.App.3d 446, 453 [same]; see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 120 [admission of expert testimony the defendant knew the difference between right and wrong was harmless because "there is no reasonable probability

the jury would have reached a more favorable verdict if the trial court had not allowed [the expert witness] to answer this question"].)[7] As the trial court observed, the prosecution had "a very strong case." Terrazas, who made eye contact with Butchart and Urista at the shooting, identified them at trial as the individuals who killed his friends. Officer Talledo recognized Butchart as the shooter in the surveillance video based on Butchart's tattoos, clothing, and demeanor. The SUV in the surveillance video was Urista's. Cell phone records placed Butchart and Urista in the area of the park near the time of the shooting. And there was evidence that there was a gang motive for the shooting and that Butchart's actions in telling his mother they had to move immediately and in fleeing to Mexico manifested a consciousness of guilt. It was not reasonably probable that, even if Officer Talledo had not made the (stricken) comment about Butchart's teardrop tattoos, the result of the trial would have been different. (See *People v. Johnson*, *supra*, 6 Cal.5th at p. 582 ["the evidence that [the witness] feared defendant was quite strong, even leaving aside the reference to defendant having beaten 'two cases like this already'"]; *People v.*

---

[7] The more stringent harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] does not apply because the error Butchart and Urista contend the trial court made did not rise to the level of a federal constitutional violation. (Cf. *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1092, 1100 [applying both *Watson* and *Chapman* standards to assess prejudice where the defendant contended the trial court's denial of his motion for a mistrial based on the unexpected unavailability of his expert witness "deprived him of the opportunity to present evidence on a 'critical element in the case, in violation of [his] fair trial and due process rights'"].)

*Dunn* (2012) 205 Cal.App.4th 1086, 1100 [denial of a motion for a mistrial "was harmless" where "[t]he evidence of [the defendant's] guilt, 'though [partially] circumstantial, was tight and strong'"].)

Urista contends separately that Officer Talledo's opinion testimony about Butchart's teardrop tattoos prejudiced him because "Urista's guilt was closely tied to Butchart's," and "[a]part from his connection to Butchart, the evidence against Urista . . . was subject to competing inferences and was not especially strong." The record does not support Urista's contention. Terrazas not only identified Urista at trial, but he also stated he identified Urista in a prior court proceeding. The surveillance video showed Urista's SUV transporting the driver and gunman to the site of the shooting. Cell phone data showed Urista's cell phone accessing cellular towers in the vicinity of the crime scene before and after the shooting. Photographs showed Urista's association with the Tiny Boys gang. Although the prosecution presented Butchart and Urista as partners in crime, the jury heard considerable evidence of Urista's individual guilt.

Butchart and Urista also contend the prosecutor "exacerbated the error" by referring to the two teardrop tattoos in closing argument. The record again does not support this contention. The prosecutor referred to Butchart's facial tattoos to explain how Butchart changed his appearance after the murders by getting facial tattoos, including a tattoo of the name "Jayden" across his forehead, and wearing his hair longer ("pulled back in a ponytail") to avoid identification.[8] The prosecutor did not

---

[8] Terrazas told detectives the shooter "might have been bald." The prosecution introduced a photograph of Butchart from August 2015 showing him with closely-cropped hair.

discuss or refer to the meaning of the teardrop tattoos in closing argument.  In any event, neither Butchart nor Urista objected to the prosecutor's argument about Butchart's facial tattoos and change of appearance, thus forfeiting the argument.  (See *People v. Hoyt* (2020) 8 Cal.5th 892, 952 ["'to preserve any claim of prosecutorial misconduct, there must be a timely objection and request for admonition'"]; *People v. Powell* (2018) 6 Cal.5th 136, 171 ["'To preserve such a claim for appeal, "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety."'"].)[9]

B.    *The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 315*

1.    *Relevant Proceedings*

The trial court instructed the jury with CALCRIM No. 315 regarding how to consider eyewitness identification evidence. The court instructed:  "You have heard eyewitness testimony

---

[9]    Butchart and Urista also argue the prosecutor committed misconduct by intentionally eliciting the objectionable opinion testimony from Officer Talledo.  By failing to object on this ground at trial, however, they forfeited the argument.  (See *People v. Redd* (2010) 48 Cal.4th 691, 746-747 [defendant forfeited the argument the prosecutor "improperly introduced evidence of future dangerousness" because the defendant did not object on that basis, and "the objection must be made upon the same ground as that which the defendant assigns as error on appeal"]; *People v. Sapp* (2003) 31 Cal.4th 240, 279 [defendant's failure to object and request an admonition forfeited his contention the prosecutor committed misconduct by eliciting "propensity evidence" the defendant committed one or more homicides].)

identifying the defendants. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions." Among the 15 questions CALCRIM No. 315 lists for the jury to consider is the one challenged by Butchart and Urista: "How certain was the witness when he or she made an identification?" The instruction concludes with the reminder: "The People have the burden of proving beyond a reasonable doubt that it was the defendants who committed the crimes. If the People have not met this burden, you must find the defendants not guilty." Butchart and Urista did not object when the court instructed the jury with CALCRIM No. 315.

2. *Butchart and Urista Forfeited Their Argument*

Butchart and Urista argue CALCRIM No. 315 "authorized [their] conviction[s] based upon unreliable evidence, in violation of [their] federal constitutional right to due process." Butchart and Urista, however, forfeited their challenge to CALCRIM No. 315 because they did not object to the instruction at trial or ask the trial court to delete the certainty factor from the instruction. (See *People v. Sanchez*, *supra*, 63 Cal.4th at p. 461 ["If defendant had wanted the court to modify the [predecessor to CALCRIM No. 315], he should have requested it."]; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 [defendant's failure to object to CALCRIM No. 315 forfeited his challenge to the instruction on appeal].) Contrary to the assertion by Butchart and Urista, the trial court did not have a sua sponte duty to modify the instruction. (See *Sanchez*, at p. 461; *People v. Ward* (2005) 36 Cal.4th 186, 213.)

21

### 3. *CALCRIM No. 315 Accurately States Current California Law*

Even if preserved, the argument lacks merit. We review de novo whether an instruction correctly states the law. (*People v. Rodriguez*, *supra*, 40 Cal.App.5th at p. 199.) The California Supreme Court has upheld and approved CALJIC No. 2.92, the virtually identical predecessor to CALCRIM No. 315. (See *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 461-462; *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1232.) As with CALJIC No. 2.92, CALCRIM No. 315 lists the certainty factor in a "neutral" manner and does "not suggest that certainty equals accuracy." (*Sanchez*, at p. 462; see *Rodriguez*, at p. 200 [trial court did not err in instructing the jury on the certainty factor in CALCRIM No. 315].)

Butchart and Urista acknowledge this authority but cite the statement from Justice Liu's concurring opinion in *People v. Sanchez*, *supra*, 63 Cal.4th 411 that, "[i]n light of developments in scientific research and recent case law, there is a substantial question whether it is proper for trial courts to instruct that witness certainty is a factor bearing on the accuracy of an identification that juries should consider." (*Id.* at p. 498 (conc. opn. of Liu, J.).) The California Supreme Court has granted review in *People v. Lemcke* (June 21, 2018, G054241) [nonpub. opn.] [2018 WL 3062234], review granted October 10, 2018, S250108, to decide whether instructing a jury with CALCRIM No. 315 that it can consider an eyewitness's level of certainty in evaluating the reliability of the identification violates a defendant's due process rights. Until the Supreme Court overrules *Sanchez*, it binds us.

C.   *The Trial Court Did Not Violate Butchart's and*
     *Urista's Constitutional Rights by Imposing*
     *Restitution Fines and Court Assessments Without*
     *Determining Either Defendant's Ability To Pay*

Butchart and Urista argue the trial court violated their due process rights under *Dueñas* by imposing fines and assessments without determining either defendant's ability to pay them. The record, however, does not support their argument.

1.   *Relevant Proceedings*

The trial court imposed on Butchart a $300 restitution fine under section 1202.4, subdivision (b), a $40 court operations assessment under section 1465.8, subdivision (a)(1), for each of his five convictions, and a $30 court facilities assessment under Government Code section 70373 for each of his five convictions. The trial court stated, "The court is aware of the decision of the appellate court that the defendant is entitled to an ability-to-pay hearing. I frankly disagree with that decision and don't find it binding in a case like this. Because the defendant is getting such a long time in prison, that other authorities say he will have time to earn money toward the fines and any restitution that is ultimately imposed." Butchart did not object to the restitution fine or the court operations and court facilities assessments the trial court imposed or to the court's finding he would be able to earn money in prison to pay the fine and assessments.

The trial court imposed on Urista a $300 restitution fine under section 1202.4, subdivision (b), a $300 parole revocation fine of $300 under section 1202.45,[10] a $40 court operations assessment under section 1465.8, subdivision (a)(1), for each of

---

[10]   The trial court stayed this fine.

23

his four convictions, and a $30 court facilities assessment under Government Code section 70373 for each of his four convictions. The court stated, "And I do find that the defendant will have enough time to earn money toward the payment of the fines and fees imposed today given the length of the sentence the court has imposed." Urista did not object to the fines and assessments the trial court imposed or to the court's finding he would have time and earning capacity to pay the fine and assessments.

2.      *Applicable Law*

"[T]he assessment provisions of Government Code section 70373 and . . . section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair" because "[t]hese additional, potentially devastating consequences suffered only by indigent persons in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) "[D]ue process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Dueñas,* at p. 1164; see *People v. Santos* (2019) 38 Cal.App.5th 923, 934; *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted Nov. 13, 2019, S257844).)[11] "[T]he execution of any restitution fine imposed

---

[11]     The Supreme Court granted review in *Kopp* to consider these issues:  Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  If so, which party bears the burden of proof regarding defendant's inability to pay?

under [section 1202.4, subdivision (b),] must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164; see *People v. Belloso* (2019) 42 Cal.App.5th 647, 655, review granted Mar. 11, 2020, S259755; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1031.) A "defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; see *Santos*, at p. 934 ["it is the defendant's burden to demonstrate an inability to pay, not the prosecution's burden to show the defendant *can* pay"].)

### 3. *The Trial Court Considered Both Defendants' Ability To Pay the Fines and Assessments*

The trial court sentenced Butchart and Urista on March 13, 2019, approximately two months after we issued our decision in *Dueñas*. When the court sentenced Butchart, the court stated it disagreed with *Dueñas* and believed it was not binding. Nevertheless, the court also found that, given Butchart's long prison sentence, he would have the ability to pay the fines and assessments the court was imposing. The trial court made a similar and more definitive finding regarding Urista. Thus, to the extent Butchart and Urista did not forfeit their argument under *Dueñas*, the trial court considered Butchart's and Urista's potential to earn prison wages and determined they had the ability to pay. (See *People v. Kopp*, *supra*, 38 Cal.App.5th at p. 96 ["the trial court should not limit itself to considering only whether [the defendants] have the ability to pay at the time of

the sentencing hearing"]; *People v. Castellano*, *supra*, 33 Cal.App.5th at p. 490 ["The trial court . . . must consider all relevant factors in determining whether the defendant is able to pay the fines, fees and assessments to be imposed.  Those factors may include, but are not limited to, potential prison pay during the period of incarceration to be served by the defendant."].)  In addition to potential prison wages, there was evidence Urista bought the SUV used in the crime, owned several cell phones, and had "an employment history of sales and warehouse labor."

D.    *The Trial Court's Failure To Ask Urista if There Was Any Legal Cause Why the Court Should Not Pronounce Judgment Did Not Prejudice Him*

At the sentencing hearing, the trial court gave counsel for Urista the court's indicated sentence and stated, "If you care to comment on the court's tentative, I'm happy to hear from you." Counsel for Urista replied, "I would submit on it, Your Honor." The court asked counsel for Urista, "I did ask you if you waived arraignment for judgment and sentence?"  Counsel for Urista replied, "Yes, we do."  The trial court did not ask counsel for Urista whether there was any legal cause why the court should not pronounce the sentence.  Neither counsel for Urista nor Urista made any objections or motions before the court pronounced the sentence.

1.    *Applicable Law*

Section 1200 provides:  "When the defendant appears for judgment he must be informed by the Court . . . of the nature of the charge against him and of his plea, and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him."  (See

26

*People v. Evans* (2008) 44 Cal.4th 590, 594.) Section 1201, subdivision (b), states: "He or she may show, for cause against the judgment: [¶] That he or she has good cause to offer, either in arrest of judgment or for a new trial; in which case the court may, in its discretion, order the judgment to be deferred, and proceed to decide upon the motion in arrest of judgment or for a new trial."[12]

While the requirement under sections 1200 and 1201 "that the question be asked is substantial and a failure to ask it is fatal to the judgment if the defendant has been deprived of counsel [citation], it is not fatal where defendant is present and represented by counsel and no prejudice appears." (*People v. Thomas* (1955) 45 Cal.2d 433, 438; see *id.* at pp. 438-439 [trial court's failure to inquire under section 1200 did not prejudice the defendant because the "[d]efendant's counsel was fully advised of all circumstances bearing upon the degree of the crime and punishment to be imposed and had an opportunity to present them at the hearing" and "no objection was made"]; *People v. Ornelas* (2005) 134 Cal.App.4th 485, 488 ["'Although [section 1200] is couched in mandatory language, lack of compliance has been deemed fatal to the judgment on only rare occasions, in

---

[12] "In legal parlance, the term 'allocution' has traditionally meant the *trial court's inquiry of a defendant* as to whether there is any reason why judgment should not be pronounced. [Citations.] In recent years, however, the word 'allocution' has often been used for *a mitigating statement made by a defendant in response to the court's inquiry*." (*People v. Evans*, *supra*, 44 Cal.4th at p. 592, fn. 2.) Urista's contention the court failed to comply with section 1200 concerns the traditional meaning of allocution.

almost all of which [the] defendant was without counsel.'"];[13] *People v. Maese* (1980) 105 Cal.App.3d 710, 724 [trial court's failure to ask the defendant if he had "'any legal cause to show why judgment should not be pronounced against him'" was "'not fatal'" because "'the defendant [was] present and represented by counsel and no prejudice appears'"]; *People v. Sanchez* (1977) 72 Cal.App.3d 356, 359 ["Even the *failure to ask* [the] question [stated in section 1200] does not require reversal where the defendant is represented by counsel and no prejudice appears."].)

2.     *The Trial Court's Failure To Comply With Section 1200 Did Not Prejudice Urista*

Urista contends the trial court's failure to ask him if there was any legal cause why the court should not pronounce judgment "denied [him] a fair hearing on his motion for a new trial and new counsel." The record does not support this contention. The trial court explicitly informed the parties on January 23, 2019 after dismissing the jury that on March 13, 2019 the court would sentence Urista and hear "any motions." Urista had seven weeks to file a motion for new trial. (See § 1182; *People v. Braxton* (2004) 34 Cal.4th 798, 807.) Nothing about the trial court's failure to make the inquiry under section 1200 precluded Urista from making a motion for new trial in that

---

[13]     See, e.g., *People v. Skinner* (1966) 241 Cal.App.2d 752, 757-758 (trial court's failure to ask a self-represented defendant whether he had legal cause to show why the court should not pronounce judgment "was fatal to the judgment" because "no motion for a new trial had yet been made" and, "[l]acking the allocution required by section 1200, and lacking any other advice as to his rights, it is clear that defendant was not made aware" a motion for new trial "was open to him.")

28

seven-week period before the sentencing hearing or even an oral motion at the sentencing hearing.  The allocution required by section 1200 was not the only time Urista could have made a motion for new trial.

Because Urista had the benefit of counsel, "it was the function of that counsel, rather than of the defendant himself, to address the court on [his] behalf." (*People v. Cross* (1963) 213 Cal.App.2d 678, 682; see *id.* at p. 680 [defendant did not have a right to personally address the court after counsel stated "there was no legal cause" why judgment should not be pronounced]; see also *People v. Hamilton* (1989) 48 Cal.3d 1142, 1163 ["[w]hen the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case"].)  Counsel for Urista chose not to make a motion for new trial.  When the trial court asked counsel for Urista if he wanted to comment on the indicated sentence, counsel for Urista submitted on the court's tentative.  As in *People v. Thomas*, *supra*, 45 Cal.2d at page 438, counsel did not object he did not have an opportunity to address the court before the court pronounced the judgment.  And Urista gave every indication at the sentencing hearing (through his silence and failure to object to the sentence) he was ready to have the court pronounce judgment.  Thus, it is not reasonably probable that, had the court asked counsel for Urista if there was any legal cause why the court should not pronounce judgment, counsel would have replied in the affirmative.  (See *Cross*, at p. 684 [applying *Watson* to the trial court's failure to allow counsel to make a supplemental statement in mitigation after the court began pronouncing judgment].)

The record also belies Urista's assertion that, had the trial court inquired under section 1200, Urista would have moved for a new trial and for new counsel. Urista never suggested he wanted substitute counsel. (See *People v. Sanchez* (2011) 53 Cal.4th 80, 87-88 ["'[w]e do not necessarily require a proper and formal legal motion, but at least some clear indication by [the] defendant that he wants a substitute attorney'"]; *People v. Lucero* (2017) 18 Cal.App.5th 532, 539 [same].) As with his motion for new trial, Urista had ample time and opportunity to make a motion for new trial based on ineffective assistance of counsel or a motion for substitute counsel, but he did neither. The court's failure to ask if there was any legal cause why the court should not pronounce judgment did not curtail Urista's right to bring a motion for new trial or for new counsel, nor did it deprive him of a "fair hearing" on any such a motion. "[N]o prejudice appears" (*People v. Thomas*, *supra*, 45 Cal.2d at p. 438) from the trial court's failure to comply with section 1200.

30

## DISPOSITION

The judgment in Butchart's case is affirmed.  The judgment in Urista's case is modified to strike the 15-year minimum parole eligibility term on count 1 and count 2, and as modified, is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.